### TRANSAMERICAN FREIGHT LINES, Inc., v. UNITED STATES et al.

### Civil Action No. 274.

District Court, D. Delaware.

Aug. 10, 1943.

S. Samuel Arsht and H. Stanley Lynch (Morris, Steel, Nichols & Arsht) both of Wilmington, Del., Thomas F. Chawke, of Detroit, Mich., and Howell Ellis and John S. Powell, both of Indianapolis, Ind., for plaintiff.

Stewart Lynch, U. S. Atty., of Wilmington, Del., Tom C. Clark, Asst. Atty. Gen., Robert L. Pierce, Sp. Asst. to Atty. Gen., and Daniel W. Knowlton, Chief Counsel, and Nelson Thomas, both of Washington, D. C., for the Interstate Commerce Commission.

Before BIGGS, Circuit Judge, and WATSON and LEAHY, District Judges.

LEAHY, District Judge.

This case arises under 28 U.S.C.A. § 41 (28) and §§ 43–48, wherein Transamerican Freight Lines, Inc. (hereinafter called "Transamerican") seeks to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission which denied an application filed under Sec. 206(a) of the Motor Carrier Act 1935, 49 Stat. 543, now, as amended, Sec. 206(a) of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq., for a "grandfather" certificate to operate as a common carrier. The original applicant,[1] one Earl H. Daniel, doing business as Owl Transportation Company, is plaintiff's predecessor.

The Commission's report shows Daniel in January, 1936, sought under Section 206 (a) authorization to continue to operate by motor vehicle as a common carrier between points in New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia and the District of Columbia. The application was heard by an examiner in September, 1938. Subsequently, the examiner filed his recommendations and report to which exceptions were taken. Before the Commission acted on the examiner's report and the exceptions, Transamerican petitioned for a further hearing alleging additional material evidence not previously available. The Commission reopened the proceedings for further hearings which were held between May and September, 1940. On March 4, 1942, Division 5 of the Commission denied the application. Plaintiff then filed a motion for rehearing and re-

---

[1] Application was also made for a contract carrier permit under Sec. 209, but it is admitted no proof of such operation was submitted.

consideration. On July 6, 1942, after consideration by the entire Commission, the order complained of in this case was entered.

The transactions, by virtue of which plaintiff now seeks relief here, are somewhat complicated and call for exposition.

On May 25, 1937, Daniel agreed to sell his business, including operating rights, good-will and certain equipment to Transamerican for $7,000, within ten days after the Commission would issue the "grandfather" certificate applied for in his pending proceedings. Plaintiff made a down payment of $1,000 to bind the bargain. Prior, however, Daniel had obtained a loan of $1,000 from another company, Cooperative G.L.F. Soil Building Service, Inc. To secure this loan, he pledged his operating rights. He failed to meet this loan. On December 17, 1937, Daniel's operating rights were sold at public auction to satisfy the claim of Cooperative G.L.F. Soil Building Service, Inc. The operating rights were described in the auctioneer's bill of sale as "Interstate Commerce Commission certificates Nos. 1673 and 1674". Transamerican purchased these rights at the sale for $400. Thereafter, Transamerican never exercised its option of May 25, 1937, with Daniel as he was unable to perform his part of the agreement.

This was the result of still another set of circumstances. Daniel had purchased certain equipment for which he failed to pay. It was repossessed and a deficiency judgment was obtained against him in the fall of 1937. The judgment creditor sought and obtained in the Supreme Court of New York a receiver of Daniel's assets. A stay order was entered on December 15, 1937, restraining the transfer of any of Daniel's property. The stay prevented the confirmation of the auction sale to Transamerican held on December 17, 1937. However, on January 8, 1938, the stay order was vacated. On February 4, 1938, plaintiff notified the Commission of the purchase of Daniel's operating rights. It would appear that the sale of the operating rights to plaintiff was confirmed on March 2, 1938. Later, when all questions concerning the finality of the sale of the rights had been determined, plaintiff, on May 14, 1938, filed its application under Sec. 213, 49 Stat. 555,[2] with the Commission. On August 1, 1942, the Commission's order of July 6, 1942, dismissing Transamerican's application, became final, the Commission finding that Daniel possessed no rights to which plaintiff was successor, because Daniel had not been in continuous operation since prior to June 1, 1935.

Plaintiff's contentions are that it has been deprived of its property, e.g., its operating rights, without due process, and that the Commission's order dismissing its application is both arbitrary and unlawful.

I. Our beginning point must be the findings of the Commission. After examining all of the evidence before it, the Commission found that applicant had performed no transportation for a period of four weeks prior to the auction sale of his so-called operating rights on December 17, 1937.

The examiner's report which the Commission adopted stated:

"From March, 1935, to June 1, 1935, the abstracts indicate movements of a variety of commodities principally between points in New York, on the one hand, and points in New Jersey, Pennsylvania, Maryland, Virginia, and the District of Columbia, on the other, but with some movements between points in the above States other than New York. Operations were continued in this fashion until the middle of 1937. From this period until November 19, 1937, the date of the last shipment indicated in the exhibits, the physical scope of operations were gradually curtailed. All shipments after May 1, 1937, except one shipment, roofing paper from Manville, N. J., to Finleyville, Pa., were confined to movements between New York, N. Y., and points in New Jersey within 15 miles thereof, on the one hand, and points in western New York, on the other.

"While no explanation was made as to why applicant's operations were contracted during the latter part of 1937, the record clearly establishes that it was due to financial difficulties. Applicant's son testified that all of the equipment, with the exception of a White truck, was repossessed during the spring and summer of 1937. He was uncertain as to whether that truck was repossessed before or after the sale of the operating rights on December, 1937. This witness testified that operations were con-

---

[2] This section has since been repealed. The 1940 amendment to the Act carries the substance of the section into Sec. 5 of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 5.

ducted during December 1937 in leased equipment but was not certain whether applicant's equipment also was used. He stated that: 'The last month of operations is quite vague'. The president of Transamerican testified that operations ceased the latter part of November 1937. A witness who was a general assistant in the office of applicant stated that his relations with applicant were severed November 20, 1937. Viewing this evidence as a whole, the inference is clear that applicant performed no transportation for a period of 4 weeks prior to the execution sale. Since this discontinuance was due to financial difficulties, a circumstance which repeatedly has been found to be not beyond the control of applicants, it has not been shown that applicant has fulfilled the prerequisites to a certificate or permit as set forth in section 206(a) or 209(a) of the act."

The Commission, adopting the recommended report of the examiner, reviewed applicant's operations prior to December 17, 1937, and said: " * * * In support of the contentions that there was no discontinuance of operations prior to December 17, 1937, the exceptant relies entirely on the vague and unsupported oral testimony of applicant's son that operations up to that date were conducted by use of leased equipment; this, in spite of the fact that in the first report served in this proceeding on December 28, 1938, the examiner found that applicant's operations had ceased entirely on November 21, 1937. The burden of proof is upon applicant to establish the character and scope of his operations and the truth of every essential allegation in his application. Where, as in the instant case, there is doubt as to the continuity of the operation, the statements of applicant's son, standing alone, are insufficient, and documentary evidence or testimony of supporting witnesses familiar with the operation is necessary to sustain that burden."

Plaintiff argues that an order of an administrative body based upon findings made without evidence or upon evidence which clearly does not support the findings or upon rejection of uncontroverted evidence may constitute an arbitrary act which results in a denial of due process,[3] and when a lawful business is thus affected, a party may invoke the judicial power to obtain constitutional protection against the administrative agency's order. Plaintiff, charging confiscation, asks us to examine the weight of the evidence adduced before the Commission and exercise an independent judicial judgment upon the facts on the authority of Baltimore & O. R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209; and St. Joseph Stockyards v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033.

This rule has been referred to as the "constitutional fact" doctrine. Its genesis is in Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 289, 40 S.Ct. 527, 64 L.Ed. 908, and Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598. It has been limited, however, to situations where the constitutionality of the administrative action is dependent upon a particular issue. For example, the St. Joseph Stockyards and Baltimore & Ohio R. R. Co. cases, relied on by plaintiff, involved the factual issue of confiscation in violation of the due process clause in connection with rate-fixing.

There can be little doubt but that Congress has the right to regulate motor carriers in interstate commerce. A decision on whether one is entitled to a permit under the "grandfather" provisions of the statute raises no constitutional issue of fact with respect to an examination of all the evidence de novo.

Plaintiff's contention comes down to this: An adverse decision under the "grandfather" clause, if it puts an applicant out of business, constitutes a violation of the due process provision of the Fifth Amendment. One of the original purposes of the "grandfather" provision was to permit the operation of carrier businesses already established on June 1,

3 Northern Pacific Railway Co. v. Department of Public Works, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 837; Baltimore & O. R. Co. v. United States, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667; Interstate Commerce Commission v. Union P. R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; Railroad Commission v. Pacific Gas & Electric Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Ohio Utilities Co. v. Public Utilities Commission, 267 U.S. 359, 45 S.Ct. 259, 69 L.Ed. 656.

1935, and if one is unable to convince the Commission that he comes within the category of Sec. 206(a), he may still secure a certificate upon proof of public convenience and necessity under Sec. 207, if in the opinion of the Commission the issuance of such a certificate is warranted.

In United States v. Maher, 307 U.S. 148, 158, 59 S.Ct. 768, 771, 83 L.Ed. 1162 the Supreme Court recognized that whether an applicant was entitled to a certificate under Sec. 206(a) "was bound to raise controverted matters of fact", the "determination" of which "Congress entrusted to the Commission."

Plaintiff's main complaint is that the Commission had no business to reject the uncontradicted testimony of Alfred Daniel —son of the applicant—to the effect that his father's operations continued without interruption until December 17, 1935. The Commission, as we have said, thought this testimony "vague and unsupported." [4]

■ But, this was still a factual decision. The issue of credibility is for the Commission, as it is for a jury.[5] Or, as was said in Loving v. United States, D. C., 32 F.Supp. 464, 467, affirmed 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387: "The hearing of evidence is an exclusive function of the Commission and it may disbelieve or disregard any evidence as it seems unconvincing; it may give as much or as little weight to evidence as it seems proper." The reason the fact-finding group—be it jury or administrative body— may reject uncontradicted testimony is their belief in the improbability of the statements made, omissions in the account of the particular transaction, the conduct and manner of the utterer or his attempt to color the facts. Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L.Ed. 501; Fire Association of Philadelphia v. Weathered, 5 Cir., 54 F.2d 779; American Casualty Co. of Reading v. Windham, 4 Cir., 107 F.2d 88; Humphreys v. Commissioner, 7 Cir., 125 F.2d 340.

■ The Commission found young Daniel's statements contradictory, i. e., after testifying that operations did not cease until December 17, 1937, he later stated, "It was in December when Owl went out of business, at what date I cannot tell you.", and he again stated, "the last month of operations is quite vague." The Commission placed his testimony in juxtaposition to that of Purdy, the general assistant in Daniel's office, who testified he left the company on November 20, 1937; and to the fact there was not a single shipping bill beyond November 19, 1937, though there were many bills for the period prior to November 19, 1937.[6] The burden of proof in support of its application under the "grandfather" provision was upon plaintiff. McDonald v. Thompson, 305 U.S. 263, 59 S.Ct. 176, 83 L.Ed. 164. The Commission simply arrived at the conclusion that plaintiff had failed to meet that burden by failing to show any operations after November 21, 1937.

■ II. The right to conduct a lawful business is a property right [7] and plaintiff's contention that the denial of its right to operate is a privilege which should be judicially protected would be sound if we had a different setting. The right to conduct the particular type of business plaintiff seeks to conduct is not plenary. No one has the right to use the highways as a common carrier. Such use is limited by the commerce clause as well as by the police power. Federal, state and municipal regulation is, of course, based upon the public interest. And the use of the highways for purposes of gain is subject to the conditions the legislature may see fit to impose on such use, Packard v. Banton, 264 U.S. 140, 144, 44 S.Ct. 257, 68 L.Ed. 596; Stephenson v. Binford, 287 U.S. 251, 264, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.

---

[4] Plaintiff's president who of course is an interested party, testified that Daniel ceased operations in the latter part of November, 1937.

[5] This Circuit has recently held that the probabilities of truth in a witness' testimony were for the jury whose duty it is to accept and interpret such of the testimony as seems credible and to reject the improbable. United States v. Reginelli, 3 Cir., 133 F.2d 595, and United States v. Palese, 3 Cir., 133 F.2d 600.

[6] Testimony in the record discloses that a fire destroyed certain records in the New York office. The Commission found that this testimony related to various leases with operators. There was testimony, however, that shipping bills might have been among the destroyed records.

[7] New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813, 32 A.L.R. 661; Louis K. Liggett Co. v. Baldridge, 278 U. S. 105, 49 S.Ct. 57, 73 L.Ed. 204.

R. 721. Hence, we reject plaintiff's contention that an unapproved transfer of a claim to a "grandfather" certificate confers upon the purchaser a conditional right to carry on the business formerly conducted by one who has applied to the Commission for such certificate.

III. The Commission—finding interruption of operations—concluded plaintiff had failed to show the continuous operations required by Sec. 206 as a condition precedent to any right to a certificate. However, plaintiff complains that even if there was an interruption of service, it was merely for 28 days and such an interruption is not such as to deny its right to a certificate in the light of the interpretations repeatedly placed on Sec. 206 by the Commission.

Sec. 206 provides for the issuance of a certificate to a common carrier which was in bona fide operation on June 1, 1935, and which "has so operated since that time" except "as to interruptions of service over which the applicant or its predecessors in interest had no control." No reference is made as to what period of time may constitute an interruption. Plaintiff points out that the interruption must be substantial and must have extended for a sufficient length of time to constitute an interruption within the meaning of the statute.

■ It is difficult to find a schema in the various rulings of the Commission as to the length of time necessary to constitute an interruption of service,[8] and we shall not attempt to make a pattern of the various administrative rulings on the question.[9] Time considered in vacuo is not the sole, and may not even be the dominant, consideration. As in cases involving the equitable doctrine of laches, the mere passage of time may or may not be significant depending upon the attendant circumstances. It seems to us that the various decisions of the Commission, which hold that a particular length of time is insufficient to constitute an interruption of service, have little weight as precedents when cited to different factual situations. What the Commission does, we think, is to examine the evidence of interruption or continuous operation under the particular facts of each case.

■ We think there was sufficient evidence before the Commission upon which it predicated its finding that there was no affirmative intent on the part of Daniel to continue his operations. It found that Daniel had not only abandoned his business but apparently his home, his family and his associates as well; and that he went into hiding. While his son, together with a former employee, made several shipments, the record failed to disclose that they were agents of Daniel or ever made an accounting with the absent owner. The son used the facilities left by his father apparently for his own benefit until Daniel's creditors made seizure to protect their claims.

IV. Although Daniel's application was based solely upon the "grandfather" proviso of Sec. 206, nevertheless the examiner received evidence on the question of public

---

[8] The "grandfather" clause of the Motor Carrier Act of 1935 for contract carriers is similar to the "grandfather" clause for common carriers, except that the date is one month later—July 1, 1935, instead of June 1, 1935. The contract carrier "grandfather" clause in Sec. 209 and the language relating to interruptions of service is the same as the language of the proviso of Sec. 206 relating to interruptions of service. Administrative rulings relating to interruptions of service with respect to contract carriers would appear to be apt when examining common carrier cases.

[9] (a) In John Minnehan, 26 M.C.C. 533, the Commission held that an interruption of service of one year did not invalidate the "grandfather" rights of the applicant. In Williams Transportation Company, Inc., 2 F.C.C. 152, an interruption of approximately three years was approved; in Edward Francis Riley, Common Carrier Application, 3 F.C.C. 191, the period was approximately five years; in J. L. Querner, 2 F.C.C. 165, the interruption was five months; in Charles Allison Knight, 30 M.C.C. 364, it was one year; in William J. Flamming, 20 M.C.C. 63, it was six months; in Werden Barringham, 20 M.C.C. 606, it was two years and nine months; and in Harry Pachall, 14 M.C.C. 224, it was more than five years.

(b) It would appear that in Truck Transport, Inc., 22 M.C.C. 70, a cessation from January 13 to February 11 of the same year was held to extinguish "grandfather" rights. In Lewis Motor Transp. Lines, Inc., 23 M.C.C. 197, three weeks interruption was held sufficient to lose such rights; in Shute, 26 M.C.C. 806, it is not entirely clear whether the period was a month; in Cook and Koch, 27 M.C.C. 361, the period was four months; and in Safeway Trails, Inc., 32 M.C.C. 189, the Commission claims the period was from January 1, 1936 to February 7 of the same year.

convenience and necessity as if application had also been filed under Sec. 207. Plaintiff urges that, once having received such evidence through its examiner, the Commission was bound to enlarge the issues and to make a finding relative to such evidence as if the application had, in fact, been also filed under Sec. 207.

The Commission is under no duty to accept evidence of factual necessity or make such a finding in an application under the "grandfather" clause of Sec. 206. United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162; Philadelphia Detroit Lines v. United States, D. C., 31 F.Supp. 188, affirmed 308 U.S. 528, 60 S.Ct. 384, 84 L.Ed. 446. Evidence of public convenience and necessity adduced under Sec. 207 falls into a category separate and distinct from that which tends to prove a bona fide continuous operation under Sec. 206 and is directed to an entirely different proposition.[10] We conclude plaintiff was not entitled to have the Commission pass upon the question whether plaintiff qualified under Sec. 207.

Plaintiff vis-a-vis Daniel has suffered financial loss. He took plaintiff's money as part payment for the sale of his business and operating rights when they were already pledged to his creditors. To protect itself, plaintiff bought his unconfirmed operating rights at auction on December 17, 1937. A consideration of such equities has no place here. Even though we might have reached a different conclusion, it is not within our scope of power to substitute our judgment for the findings of fact of the Commission or to disturb their conclusions based on such findings.

Findings of fact and conclusions of law have been filed herein, in conformity with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

[10] Plaintiff's petition for reconsideration by the entire Commission filed April 18, 1942, makes no objection to the omission of findings of factual convenience and necessity under Sec. 207. Under paragraph (a) of Sec. 17 of the Interstate Commerce Act, 49 U.S.C.A. § 17(a), it is doubtful if any error may be considered by this court unless previously presented to the entire Commission upon petition for rehearing or reconsideration; otherwise such a tactic permits an applicant to ambush the Commission.

Cf. Todd v. Securities and Exchange Commission, 6 Cir., 137 F.2d 475, June 22, 1943, Pacific Gas & Electric Co. v. Securities and Exchange Commission, 9 Cir., 127 F.2d 378, and Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. ——, March 1, 1943, for the proposition that unless the point is presented to the administrative body, consideration is forbidden of the point when urged upon the reviewing court.