STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION v. ED
FLEMING T/A FLEMING BUS COMPANY.

(Filed 11 June, 1952.)

**1. Carriers § 5—Permit for both charter and contract carrier business
should be issued upon proper showing under grandfather clause of
Bus Act.**

The purpose of the grandfather clause in the Bus Act of 1949 is to pre-
serve the *bona fide* rights existing at the time of the passage of the Act,
and where an applicant shows that he had carried on substantially and
regularly the business of contract carrier and also that of a charter carrier
for a number of years prior to and at the time of the passage of the Act,
that he had continued to render such service since its passage, that he has
the necessary equipment, and is financially responsible and otherwise quali-
fied to perform the services on a continuing basis, *held:* such applicant is
entitled to permits to continue his business both as a contract carrier and
charter carrier (G.S. 62-121.52 (9)) upon his application timely filed under
the provisions of G.S. 62-121.50, notwithstanding he is not a common carrier
as defined by G.S. 62-121.46 (5). The provisions of G.S. 62-121.46 (6) (d)
relating to charter operations are prospective in effect; to make its defini-
tive and regulatory provisions retroactive in effect so as to limit the rights
of an applicant under the grandfather clause would be in contravention of
constitutional rights and contrary to due process of law. Constitution of
North Carolina, Art. I, sec. 17; Fifth and Fourteenth Amendments to the
Constitution of the United States.

**2. Utilities Commission § 3—**

G.S. 62-121.52 (5) relates to an amendment by a petitioning carrier which
would enlarge or in any manner extend the scope of its operations, and
has no application to an amendment which merely clarifies a carrier's peti-
tion under the grandfather clause to continue the same business operations
the carrier had been engaged in prior to the passage of the Bus Act of 1949.

**3. Same—**

Where a carrier files an application under the grandfather clause of the
Bus Act of 1949 for "Contract Carrier Permit" and it is clearly understood
by the Commission and all the parties that the application was for the pur-
pose of obtaining permits for the carrier to continue all business operations
he was then and had been engaged in, which included both contract and
charter bus operations, the admission by the Commission of evidence of
previous charter operations will not be held for error notwithstanding that
the Commission had denied the carrier's motion to amend.

**4. Carriers § 5—**

An applicant seeking to preserve rights confirmed to him by the grand-
father clause of the Bus Act of 1949 is required to show neither public
convenience and necessity nor public need.

**5. Same—**

Rates filed and published by a contract carrier under the provisions of
G.S. 62-121.66 (1) are "tariffs" within the meaning of G.S. 62-121.65, so

as to form the basis for the granting of a permit to such applicant as a charter carrier.

APPEAL by applicant from *Burney, J.,* February Term, 1952, of PITT.

The applicant, Ed Fleming trading as Fleming Bus Company, hereinafter called appellant, filed with the North Carolina Utilities Commission his duly verified "Grandfather Application for Contract Carrier Permit," under the provisions of section 8 of The Bus Act of 1949 (G.S. 62-121.50).

On the basis of the information required to be submitted with the above application, the Commission, on 14 October, 1949, issued to the appellant a temporary permit to operate as a contract carrier by motor vehicle pending a hearing to determine his grandfather rights under the provisions of G.S. 62-121.50, of The Bus Act of 1949 (Article 6C, G.S. 62-121.32 through G.S. 62-121.79). This permit as revised on 7 April, 1950, expressly authorized the holder thereof to transport passengers under written contract with particular passengers or groups of passengers between the following points:

"From Greenville, N. C., Cox's Mill, N. C., Calico, N. C., Vanceboro, N. C., and New Bern, N. C., to Cherry Point, N. C., and return. From Greenville, N. C., Winterville, N. C., Ayden, N. C., Grifton, N. C., Kinston, N. C., and Richlands, N. C., to Camp Lejeune, N. C., and return."

Within the time required by subsection (5) of G.S. 62-121.52, protests and motions to intervene were filed with the Commission by Atlantic Greyhound Corporation, Carolina Coach Company, Queen City Coach Company, and Seashore Transportation Company.

The appellant—a colored man, testified that he began his bus operations in 1925, with one bus; that he started hauling people from Greenville and different places to the beach. Later on he began making trips for schools, lodges, churches, Sunday Schools, 4-H Clubs, and others; that he carried groups to conventions, church meetings, to the Lost Colony, to Raleigh, Greensboro, High Point, and Elizabeth City as well as to Negro swimming places in the eastern part of the State, one being at Washington, one near Oriental, and the other at Sea Breeze near Wilmington; that he transported Negro passengers only and that during the year 1949 he made between four and five hundred such trips. The charter service has been rendered on the basis of a fixed fee of 35c per mile for a twenty-five passenger bus, and 50c a mile for a bus with a capacity of more than twenty-five passengers.

In addition to the charter bus business built up by the appellant during the period of twenty-four years, prior to the enactment of The Bus Act of 1949, he began a contract carrier business in 1940, which developed to a point where, during World War II, he was transporting from three to four hundred men per day from various places to and from Cherry Point,

Camp Davis, and Camp Lejeune. During this period the Rationing Board granted him tires and gas and other necessary equipment to carry on his bus operations; that he was engaged in such contract carrier business on 1 October, 1948. On 1 October, 1949, the appellant owned ten buses. Two of these at the time of the hearing were being used in the appellant's business as a contract carrier to transport passengers from the points enumerated above to Cherry Point and return and to Camp Lejeune and return. The others were being used in his charter bus business.

The equipment of the appellant is regularly inspected by a representative of the Utilities Commission.

The appellant, in support of his financial ability to maintain his equipment and to render adequate charter and carrier service, filed with the Commission a financial statement as of 31 December, 1949, showing assets of $95,333.26 and no liabilities.

The appellant also offered three witnesses who corroborated him in general with respect to the character of service he had been rendering for many years. Twenty-five other witnesses were tendered and offered to corroborate the testimony of the appellant and his three other witnesses.

During the course of the hearing, the protestants objected to the introduction of any evidence on the part of the appellant with respect to his charter operations; the objections were overruled and exceptions noted. Thereupon, counsel for the Carolina Coach Company and the Queen City Coach Company stated that their clients did not protest the granting of a permit to the appellant provided such permit did not carry with it any incidental rights to handle charter trips or any other service beyond the scope of a contract carrier permit as defined in The Bus Act of 1949. Whereupon, the appellant moved to amend his application so as to include the right to continue all the services he had been rendering theretofore. This motion was denied and the appellant excepted.

The order of the Commission contains a statement to the effect that as a matter of common knowledge, the appellant herein and others, in addition to contract carrier operations, have been for some years engaged in transporting charter parties on numerous occasions and to various points and places throughout the State, and that this appellant and others made inquiry of the Commission as to whether or not they were entitled to continue their charter operations after the passage of The Bus Act of 1949; that the Commission being in doubt as to whether or not the law authorized such operations by a contract carrier, advised the appellant and other contract carriers that no effort would be made to prevent contract carriers from transporting charter parties pending the time when the Commission should reach a decision on the question of law involved. The order of the Commission further states, "This was the situation at the

time of the hearing in the instant proceeding and it was, therefore, correctly understood by the appellant that he had continued to do charter work at least with the acquiescence of the Commission."

The Commission found as a fact from the evidence, that the application was filed before 1 October, 1949 as required by The Bus Act of 1949; that the appellant was operating as a contract carrier as defined in the Act, on 1 October, 1949, and has continuously so operated since that time; that he has the necessary equipment; is financially responsible and is otherwise qualified to perform the contract carrier service applied for on a continuing basis, and granted the appellant a contract carrier permit and directed that such permit be issued.

The Commission further found, "that the applicant has furnished a charter bus service over a period of years continuously and is now doing so, in addition to the contract carrier service, as defined in the Act. As to the said charter service, the Commission is of the opinion that as a matter of law it has no power to authorize or permit the applicant to continue in the performance of charter service as incidental to his operating rights as a contract carrier under provisions of the 1949 Bus Act. . . . The applicant is a CONTRACT carrier, as defined in the Act, and there is nowhere any provision for this class of carriers doing charter work as common carriers are permitted by the Act to do. This would appear to preclude such authority from being granted or exercised as incidental to contract carrier authority. The Commission has heretofore decided that as a matter of law it has no power under the Bus Act of 1949 or any other law to entertain an independent application for or to grant by permit or certificate authority to operate as a charter party carrier on the basis of public necessity and convenience.

"The Commission is not unaware of the fact that the applicant has considerable investment in equipment and has built up over a period of years a charter service business which he is most reluctant to give up and which may very well be answering a public need and convenience among the colored population in that general area. To these matters, however, the Commission is not in a position to give consideration in the instant proceeding nor under the present law according to the best interpretation the Commission can put on it."

Thereupon, the Commission directed that the "applicant immediately cease and desist from performing any and all charter bus service and to confine his operations strictly to those of a contract carrier, as defined in the Act, and in accordance with the particular rights hereby granted, unless and until otherwise lawfully authorized."

Petition for rehearing was filed in apt time and denied. The appellant appealed to the Superior Court, assigning error.

The cause came on for hearing in the Superior Court and the order of the Utilities Commission which was entered as of 24 October, 1950, was, in all respects, affirmed. The appellant appealed to the Supreme Court, assigning error.

*Dink James, Kenneth C. Hite, Ruark & Ruark, and Joseph C. Moore for appellant.*

*Attorney-General McMullan and John Hill Paylor, Assistant Attorney-General, for Utilities Commission.*

*Fuller, Reade, Umstead & Fuller and J. Ruffin Bailey for Atlantic Greyhound Corporation.*

*Arch T. Allen for Carolina Coach Company.*

*Shearon Harris and Vaughan S. Winborne for Queen City Coach Company.*

*Ward & Tucker for Seashore Transportation Company.*

DENNY, J. The Bus Act of 1949, being Chapter 1132 of the 1949 Session Laws of North Carolina, in section 2 thereof, codified as G.S. 62-121.44, contains a declaration of policy which reads as follows: "Upon investigation, it has been determined that the transportation of passengers by motor carriers for compensation over the public highways of the State is a business affected with a public interest, and is hereby declared to be the policy of the State of North Carolina, among other things, to provide fair and impartial regulation of motor carriers of passengers in the use of the public highways in such a manner as to promote, in the interest of the public, the inherent advantages of highway transportation; to promote adequate economical and efficient service to all of the communities of the State by motor carriers engaged in the transportation of passengers over the public highways for compensation; to encourage the establishment and maintenance of reasonable charges for transportation services without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to encourage and promote harmony among motor carriers of passengers, between such carriers and carriers of passengers by rail or water, and between all carriers of passengers and the traveling public; to foster a coordinated State-wide motor carrier service; to conform with the national transportation policy and the Federal Motor Carrier Act in so far as the same may be found practical and adequate for application to intrastate commerce; and to co-operate with other states and with the federal government in promoting and coordinating intrastate and interstate commerce by motor carriers."

Section 3 of the Act, codified as G.S. 62-121.45, vests in the North Carolina Utilities Commission authority to administer and enforce the

provisions of The Bus Act of 1949, and to make and enforce reasonable and necessary rules and regulations to that end.

In light of the declaration of policy contained in The Bus Act of 1949, and the grandfather clause contained therein, we must determine whether the appellant is entitled to charter party rights as a contract carrier.

We think it is essential to a clear understanding of the question involved in this appeal to set out certain definitions and provisions contained in The Bus Act of 1949, and to point out wherein they differ from the Federal Motor Carrier Act.

A common carrier is defined in The Bus Act of 1949 as "any person which holds itself out to the general public to engage in the transportation by motor vehicle in intrastate commerce of passengers for compensation over regular routes and between fixed termini." G.S. 62-121.46 (5).

A common carrier is defined in pertinent part in the Federal Motor Carrier Act as, "any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes." U.S.C.A. Title 49, section 303 (14).

A contract carrier is defined under our Act as, "any person not included in the definition of 'common carrier by motor vehicle' which, under individual contracts or agreements, engages in the transportation by motor vehicle of passengers in intrastate commerce for compensation. Such contracts (a) must be in writing, (b) must provide for the transportation of particular persons or group of persons, (c) must be bilateral and impose specific obligations upon both the carrier and the other contracting parties, (d) must cover a series of trips in contrast to a single trip, and (e) a copy of which must be preserved by the carrier until terminated by its terms and at least one year thereafter." G.S. 62-121.46 (6).

A contract carrier under the Federal Act is defined as, "any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section and the exception therein) by motor vehicle of passengers or property in interstate or foreign commerce for compensation." U.S.C.A. Title 49, section 303 (15).

It will be noted that under the Federal Act, a common carrier by motor vehicle is not limited to those engaged in transportation of passengers and property between fixed termini. Therefore, it is clear that if the appellant herein had been operating in interstate commerce instead of intrastate commerce, there could be no question about his being a common carrier with respect to his charter operations. *Crescent Express Lines v. United States,* 320 U.S. 401, 88 L. Ed. 127; *Alton R. Co. v. United*

*States,* 315 U.S. 15, 86 L. Ed. 586. However, under the definition of a common carrier by motor vehicle in our Act, no common carrier by motor vehicle would be authorized to render charter service were it not for the permissive privilege to render such service contained in G.S. 62-121.52 (9), which reads as follows: "Common carriers by motor vehicle transporting passengers under a certificate issued by the Commission may operate to any place in this State, pursuant to charter party or parties, trips originating on such common carrier's authorized routes or in the territory served by its routes under such reasonable rules and regulations as the Commission may prescribe."

The North Carolina Utilities Commission adopted certain rules and regulations pursuant to the authority contained in The Bus Act of 1949, effective from and after 1 October, 1950, among them being Rule 27, pertaining to charter service. The pertinent parts of Rule 27 read as follows: "The right of a common carrier to transport passengers by motor vehicle in intrastate commerce includes the right, unless restricted by its certificate or by an order of the Commission, to engage in charter service under the following conditions: (a) The service shall be limited to the transportation of a charter party as defined by Section 4 (3) of the Bus Act, and at a fixed charge for the use of its vehicle or vehicles as set out in its published tariff. . . . (c) A common carrier may originate charter service at any point on its regular route, and at any point not served by another common carrier within five miles of its regular route. Points more than five (5) miles from the regular route of any common carrier shall be deemed open territory for the purpose of originating charter service, and any common carrier may originate charter service at any such point. (d) If for good cause, a carrier cannot transport a charter party when requested to do so, it shall so notify the charter party, or its representative, in writing, and shall mail the Commission a copy of such notice, in which case the Commission may arrange for such service by some other common carrier. . . ."

A "charter party," referred to in the above rule, is defined in G.S. 62-121.46 (3) as, "a group of persons who, prsuant to a common purpose and under a single contract, and at a fixed charge for the vehicle in accordance with the carrier's tariff, lawfully on file with the Commission, have acquired the exclusive use of a passenger carrying motor vehicle to travel together as a group from a point of origin to a specified destination or for a particular itinerary, either agreed upon in advance or modified by the chartering group after having left the place of origin."

As a matter of fact, a common carrier by motor vehicle was not expressly authorized by statute to render charter service, in this State, prior to the enactment of The Bus Act of 1949. And prior to such time, contract carriers were not regulated by nor under the control of the North

Carolina Utilities Commission. Even so, prior to the enactment of The Bus Act of 1949, contract carriers and common carriers engaged extensively in rendering such service.

Consequently, it is not contended by the appellees that the appellant, prior to the passage of The Bus Act of 1949, was required to obtain either a franchise certificate or a contract carrier permit from the Utilities Commission in order to engage in charter service or as a contract carrier of passengers. In view of this fact, it becomes necessary to consider what rights the appellant is entitled to under the grandfather clause contained in The Bus Act of 1949. Since the appellant did not hold a franchise certificate as a common carrier to operate over designated highways and between fixed termini, as provided in G.S. 62, sections 105 and 106, now repealed but in effect at the time of the passage of the 1949 Act, he is not entitled to a certificate of public convenience and necessity under the terms of the grandfather clause granted in G.S. 62-121.49.

On the other hand, he is entitled, as a matter of law, to a permit under the grandfather clause with respect to contract carriers (G.S. 62-121.50) that will permit him to continue operating his business as a charter and contract carrier if he was engaged in *bona fide* operations rendering such service prior to the passage of The Bus Act of 1949 and is continuing to render such service since the passage of the Act.

The Supreme Court of the United States in interpreting the meaning and effect of the grandfather clause contained in the Federal Motor Carrier Act, in the case of *Crescent Express Lines v. United States, supra,* said: "The statute, . . . contemplated 'substantial parity' between future and prior operations," citing *Alton R. Co. v. United States, supra.* To like effect are the following decisions: *United States v. Carolina Freight Carriers Corp.,* 315 U.S. 475, 86 L. Ed. 971; *Goncz v. Interstate Commerce Commission,* 48 F. Supp. 286; *Chicago, St. P., M. & O. Ry. Co. v. United States,* 50 F. Supp. 249, affirmed 322 U.S. 1, 88 L. Ed. 1093; *Transamerican Freight Lines v. United States,* 51 F. Supp. 405; *Peninsula Corp. v. United States,* 60 F. Supp. 174.

In the case of *McCracken v. United States,* 47 F. Supp. 444, the court in considering a motor carrier's rights under the grandfather clause contained in the Federal Motor Carrier Act, said: "There is often a clear conflict between the public convenience and necessity and the rights thus confirmed. However, the principle is clear that if the operator had strictly complied with the requirements of the statute, his right to operate should be recognized. . . . While the Commission had no power to take away any rights or privileges thus confirmed by Congress to an established operator, they could place such terms in the certificate as were required by public necessity to make the operations conducted thereunder consistent with operations carried on by others and convenient for the public."

The appellees contend that a contract carrier, as defined in our Act, cannot perform charter service since contracts of a contract carrier must cover a series of trips in contrast to a single trip. G.S. 62-121.46 (6) (d). The first sentence in this section defines a contract carrier as "any person not included in the definition of a common carrier by motor vehicle and which, under individual contracts or agreements, engages in the transportation by motor vehicle of passengers in intrastate commerce for compensation." Clearly this definition includes charter service, unless such service is excluded by the remaining provisions in the section or by other provisions in the Act. The appellees argue and contend that the further provisions in this section delimit the scope of service a contract carrier may perform to such an extent as to exclude the exercise of charter rights under a permit issued pursuant thereto. There might be merit in such contention with respect to an application for a permit as a contract carrier pursuant to the provisions of the Act, separate and apart from any grandfather rights contained therein. But we hold that the provisions contained in this section, which the appellees contend exclude any right to render charter service under a contract carrier permit, are definitive or regulatory and intended to be applied prospectively with respect to applications for permits as contract carriers under the general provisions of the Act, and have no bearing on or relation to the grandfather rights confirmed in the Act. Whether such provisions are valid we need not now decide. To make these definitive and regulatory provisions retroactive so as to place a limitation on the rights of the appellant under the grandfather clause contained in the Act, would be in contravention of his constitutional rights and contrary to due process of law. Article I, section 17, Constitution of North Carolina; Fifth and Fourteenth Amendments of the Constitution of the United States. Moreover, such a construction would completely nullify the grandfather clause and make it feckless.

The purpose of a grandfather clause is to protect and preserve *bona fide* rights existing at the time of the passage of the legislation which contains such clause. Other provisions in such Act intended to apply to applicants seeking rights thereunder, separate and apart from any grandfather rights confirmed therein, will not be permitted to impinge upon or defeat such rights as are intended to be protected by the grandfather clause.

The appellees likewise contend that the appellant had no right to amend his application as requested, due to the provision in subsection (5) of G.S. 62-121.52, which reads as follows: "No certificate or permit shall be amended so as to enlarge or in any manner extend the scope of operations of a motor carrier without complying with the provisions of this section." The contention is without merit. In the first place, the appellant was not seeking to amend a permit so as to enlarge or in any manner

extend the scope of his operations. He was only seeking to amend his application so there could be no question about his position with respect to his charter rights. In the second place, the protestants, with the exception of Seashore Transportation Company, never interposed the slightest objection to the appellant's application except as it related to charter rights. And counsel for the Carolina Coach Company and Queen City Coach Company stated in open court that they had no objection to the appellant's request for a contract carrier permit provided he was not permitted to render charter service thereunder.

While it would have been proper to have allowed the amendment as requested, we do not think its denial has any material bearing on the merits of the controversy. It was clearly understood by the Commission and the protestants that the appellant was seeking a contract carrier permit that would authorize him to continue his charter and contract business in the same general manner he had been operating such service prior to and since the passage of The Bus Act of 1949. Moreover, the only burden resting on the appellant was to show that he was a *bona fide* operator engaged in charter service and in the transportation by motor vehicle of passengers in intrastate commerce for compensation, at the time of and prior to the passage of the Act, and that he had continued to render such service since its passage; that he had the necessary equipment; was financially responsible and otherwise qualified to perform the service he seeks to render on a continuing basis. An applicant seeking to preserve rights confirmed to him in a grandfather clause, is required to show neither public convenience and necessity, nor public need. *United States v. Carolina Freight Carriers Corp., supra; McDonald v. Thompson,* 305 U.S. 263, 83 L. Ed. 164; *Chicago, St. P., M. & O. Ry. Co. v. United States, supra; McCracken v. United States, supra.*

On this record, according to the Commission's findings, the appellant has met the burden of proof required of him in every essential particular.

The appellees also contend that a contract carrier may not be authorized to render charter service because the charges to be made for such service are determined by a "tariff, lawfully on file with the Commission." They state in their brief, in support of this contention, that "only common carriers by motor vehicle file tariffs with the Utilities Commission; contract carriers by motor vehicle do not. Section 23 of the Act (G.S. 62-121.65)." They appear to have overlooked the provisions of section 24 of the Act (G.S. 62-121.66), which, in pertinent part, reads as follows: "(1) It shall be the duty of every contract carrier to establish and observe reasonable minimum rates and charges for any service rendered or to be rendered in the transportation of passengers or in connection therewith, and to establish and observe reasonable regulations and practices to be applied in connection with said reasonable minimum rates and charges.

It shall be the duty of every contract carrier to file with the Commission, publish, and keep open for public inspection, in the form and manner prescribed by the Commission, schedules containing the minimum rates or charges of such carrier actually maintained and charged for the transportation of passengers in intrastate commerce, and any rule, regulation, or practice affecting such rates or charges and the value of the service thereunder. No such contract carrier, unless otherwise provided by this article, shall engage in the transportation of passengers in intrastate commerce unless the minimum charges for such transportation by said carrier have been published, filed, and posted in accordance with the provisions of this article." We do not construe the word "tariff," used in connection with the rates of a common carrier, to have any special legal significance that would differentiate it in effect from the word "rates," used in connection with a contract carrier. Moreover, an examination of rates or tariffs filed with the Utilities Commission for charter service by a number of common carriers, some operating in intrastate commerce and others operating both in intrastate and interstate commerce, reveals that such service is now being rendered on a mileage basis per coach, or for an hourly or daily charge for a coach; and that the charges vary depending on the seating capacity of the coach. There is likewise some variance in the rates charged by different carriers.

We hold that on the undisputed evidence adduced in the hearing before the Utilities Commission, and the facts found by the Commission, which facts are amply supported by the evidence, the appellant is entitled, as a matter of law, to a contract carrier permit authorizing him to continue to operate as a charter and contract carrier on a substantial parity between his future and prior operations. The Commission may impose upon the holder of this permit any reasonable rules and regulations with respect to the operations thereunder which are now in effect or which may be adopted hereafter for the regulation of motor vehicle carriers performing similar service. In other words, he must file his rates in compliance with the provisions of G.S. 62-121.66, and comply with all other reasonable rules and regulations of the Commission.

The order of the Commission entered 24 October, 1950, except in the respects pointed out herein, is affirmed, and the proceeding is remanded to the Superior Court to the end that it may direct the Commission to modify its order in accord with this opinion.

Modified and affirmed.