ROADWAY EXPRESS, INC., et al.,
Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants,

and

National Tank Truck Carriers, Inc., et al.,
Intervening Defendants.

Civ. A. No. 2419.

United States District Court
D. Delaware,
Jan. 21, 1963.

Caleb M. Wright, Chief Judge, dissented.

George Tyler Coulson, Wilmington, Del., Guy H. Postell, Atlanta, Ga., Howell Ellis, Indianapolis, Ind., William O. Turney, Washington, D. C., and Roland Rice and John C. Bradley, of Rice, Carpenter & Carraway, of Washington, D. C., for plaintiffs.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., Lee Loevinger, Asst. Atty. Gen., and John H. D. Wigger, Washington, D. C., for United States.

James Y. Piper and Robert W. Ginnane, Washington, D. C., for Interstate Commerce Commission.

H. James Conaway, Jr., and Samuel R. Russell, of Morford, Young & Conaway, Wilmington, Del., Nuel D. Belnap and Richard J. Hardy, of Belnap, Spencer, Hardy & Freeman, Chicago, Ill., Harry C. Ames, Jr., and E. Stephen Heisley, of Ames, Hill & Ames, Washington, D. C., and Leonard A. Jaskiewicz and Ronald N. Cobert, of Dow, Lohnes & Albertson, Washington, D. C., for intervening defendants.

Before BIGGS, Chief Circuit Judge, WRIGHT, Chief District Judge, and LEAHY, Senior District Judge.

LEAHY, Senior District Judge.

This action is brought by 11 plaintiffs who are 9 motor common carriers of general commodities, a manufacturer and shipper of collapsible rubber containers, and an association of motor common carriers to review certain orders of the Interstate Commerce Commission. The United States of America and the Interstate Commerce Commission are formal defendants. Intervening defendants are motor common carriers of commodities, in bulk, in tank trucks, or in other and similarly specialized vehicles, and an association of such carriers.

Two groups of multiple motor carrier application proceedings were before the ICC.[1] In both groups, numerous motor common carriers holding operating authorities from the ICC to transport general commodities, with certain commodity exceptions [2] discussed *infra*, filed with the ICC extension-of-service applications under § 206(b) of the Interstate Commerce Act, 49 U.S.C. § 306(b), for operating authorities to transport commodities not included in their previous certificates, and pleas for appropriate certificates of public convenience and necessity to issue [3] for the extension of the operations sought. These applications were coupled with requests, or motions, that the ICC, in interpreting the previously-issued certificates, dismiss the applications on the ground such outstanding certificates had already authorized transportation of commodities sought by the extension applications.

In the Western Express group of 14 application cases, and in the Best Way

---

1. Western Express Company Extension—Sealdtanks, 84 M.C.C. 585, was decided on March 22, 1961, by the entire Commission, with two commissioners dissenting; Best Way of Indiana, Inc. Extension—Containers, 86 M.C.C. 61, was decided by the entire Commission on April 28, 1961, with the same two commissioners concurring, based solely upon the previous findings of the majority in the earlier Western Express case.

2. The typical general-commodity descriptions appearing in plaintiffs' certificates read: "General commodities, except those of unusual value, class A and class B explosives, household goods as defined by the Commission, commodities in bulk, and those requiring special equipment." 84 M.C.C. 597.

Absent any exceptions to the authorization to a general carrier, the carrier may transfer any commodity in any equipment by any means of handling. Coastal Tank Lines, Inc. v. Charlton Bros. Transp. Co., 84 M.C.C. 289, 297, 301, 302 (Division 5, 1948), order sustained, Coastal Tank Lines, Inc. v. United States, 9 F.C.C. par. 80,838 (D.C., D.C., 1953); C & U Tank Lines, Inc.—Purchase—Comet Mtr. Exp. Co., 55 M.C.C. 791, 792 (Division 4, 1949); Friedman's Exp., Inc., Ext.—Naugatuck, Conn., 78 M.C.C. 644, 646 (Division 1, 1958); and Coastal Tank Lines, Inc. v. Pioneer Trucking Corp., 79 M.C.C 101, 103 (Division 1, 1959).

3. Interstate Commerce Act, § 207(a), 49 U.S.C. § 307(a).

group of 211 applications, all sought specific authority from the ICC to transport liquid and dry flowable [4] commodities in certain newly-developed "collapsible" or "stackable" rubber containers (hereafter referred to as C & S containers) over routes and territories they now serve pursuant to their existing certificates. The particular containers are marketed by one of the plaintiffs, United States Rubber Company, who sell under the trade names of "Sealdtank", "Sealdrum" and "Sealdbin".[5] The common characteristic of these containers is their collapsibility when emptied. Collapsed rubber Sealdrums, designed for transportation of liquids in quantities ranging from 55 gallons to 1,000 gallons, occupy only 20% of their loaded size; collapsed rubber Sealdbins, designed for transportation of dry flowable commodities in quantities ranging from 70 cubic feet to 300 cubic feet, occupy about 11% of their loaded size; collapsed rubber Sealdtanks, designed for transportation of liquids in quantities ranging from 450 gallons to 4,000 gallons, occupy about 3% of their loaded size.[6]

Each of the 225 applicants in the proceedings before the ICC, including the 9 motor carrier plaintiffs, is the holder of a certificate of public convenience and necessity issued by the ICC under Section 208(a) of the Interstate Commerce Act, 49 U.S.C. § 308(a), authorizing regular-route, and in some cases, irregular-route, transportation of general commodities.

However, such previously-issued certificates contain certain expressed exceptions with respect to the general commodities authorized to be transported, including, typically, exceptions proscribing transportation of "commodities in bulk" and/or "requiring special equipment."

■ Two sets of hearings were held before two different Examiners of the Interstate Commerce Commission.[7] In the 14 Western Express group of applications, Examiner Hagerty recommended that the applicants, under their existing general commodities certificates, with the exceptions noted, had authority to transport liquid and dry commodities in the Sealdbin, the Sealdrum, and other containers here involved, but not in the Sealdtanks with capacities of 1,000 gallons or in excess thereof;[8] and, he also recommended denial of the 14 applications for authority to extend service because "the present and future public convenience and necessity do not require operations by applicants * * * of liquid and dry commodities as proposed."[9]

In the 211 Best Way group of applications, Examiner Pellerzi rejected the concept of *quantity* of commodities as irrelevant to the issue as to whether the shipment is "in bulk," and made recommendations which, in most important respects, were ultimately adopted by the Commission.[10] To be noted, Examiner

4. Dry flowable materials are non-liquid substances which by reason of being in granular, powdered, pellet, or grain form are thus capable of being poured into containers.

5. An additional C & S container type discussed in Western Express is the Nest-a-Bin, a product of Kaiser Industries. Other C & S containers were developed after taking of evidence in Western Express. 84 M.C.C. 587. Separate discussion of these particular containers is unnecessary.

6. 84 M.C.C. at 614.

7. The facts upon which the Commission acted in the challenged reports were not completely detailed, but the factual

statements found by the two hearing Examiners from the evidence submitted were also considered by the Commission in arriving at its decision. Such incorporation of factual statements by reference to the Examiners' reports has been held proper. Georgia Public Service Comm. v. United States, 283 U.S. 765, 771, 51 S.Ct. 619, 75 L.Ed. 1397.

8. Examiner Hagerty's Recommended Report, p. 24.

9. Ibid.

10. The chief variation of Examiner Pellerzi's recommendations from the Commission's rulings, discussed *infra*, were the former's conclusion that ordinary trailers equipped with *carrier-owned* C

872

Pellerzi concurred with Examiner Hagerty's recommendation that public convenience and necessity were not shown to require additional service by applicants.[11]

Both groups of recommendations were appealed to the ICC, which sat *en banc* and held: 1. general commodity carriers with restrictions against transportation of commodities in bulk or those requiring special equipment were authorized to transport loose, flowable, and fungible commodities when tendered in dismounted C & S containers (i. e., not placed or mounted on or in a vehicle), whether supplied by the carrier or shipper; 2. general commodity carriers, with the exceptions noted above, were not authorized to transport such commodities when tendered into a *premounted* C & S container; and 3. tank truck carriers [Intervenors] were authorized to transport such commodities whether tendered in a dismounted or premounted C & S container, and whether supplied by carrier or shipper. Plaintiffs' alternative demand for additional authorization allowing them to carry C & S containers if such authority did not already lie in plaintiffs, was also denied.[12]

The full Interstate Commerce Commission put its ideas this way:

(1) General commodity carriers' argument that the essence of bulk transportation was the pouring, pumping or direct dumping into the transporting vehicle of commodities *"in such a manner that the commodities transported are confined*

by and adopt the shape of the interior surface of such vehicle,"* [13] was rejected;

(2) Tank carriers' argument that the essence of bulk transportation was the *volume* of the commodity carried was similarly rejected; [14]

(3) The *type service* provided by a shipper was held determinative of whether it was a carrier of "commodities in bulk";

(4) Utilization of C & S containers was held "to blur the heretofore relatively clear distinction between the field of service of the general freight carrier and that of the carrier of bulk commodities * * *;" [15]

(5) The distinction "between packaged and bulk service" was held basic and "no justification" was held "shown for applying a different rule"; [16]

(6) When a general commodity carrier fills a C & S container and then tenders it to a carrier utilizing ordinary trailer equipment, the basic ingredients of "package" service was held present; hence, the general carrier might transport the goods; finally,

(7) But " * * * when a shipper of fungible, flowable commodities tenders them loose and uncontained, that is, pours them into a C & S container which has been previously placed and mounted in or upon the carrier's vehicle, the transportation service involved must, we think, be considered beyond the scope of general-commodity authorizations restricted against the movement of commodities in bulk or those requiring the use of special equipment * * *." [17]

& S containers securely attached to the vehicle when offered for transportation were "special equipment" but not "bulk" equipment.

11. Findings and Conclusions, Examiner Pellerzi, pp. 30–40, No. MCC–82 (sub-No. 5), et al.

12. The Commission's considerations with respect to certificate construction is mainly contained in Western Express; its considerations with respect to additional authorization is contained in Best Way.

13. Plaintiffs' Brief, p. 21; cf. Brief of Associated Transport. Inc., before the Commission, p. 3; Brief of American Trucking Co. before the Commission, p. 8.

14. This position had been partially adopted by Examiner Hagerty in his Recommended Report, p. 24.

15. 84 M.C.C. 600.

16. 84 M.C.C. 601.

17. 84 M.C.C. 601, 602.

The Interstate Commerce Commission, *en banc*, denied reopening and reconsideration of the decisions in the Western Express and Best Way groups of cases.

Now, plaintiffs, here, seek a permanent injunction to issue against implementation of the ICC's orders, and argue: (1) Since shippers often fill their own containers, the Commission's decision is irrational, because it brings about differing results to carriers who provide precisely the same *service* to shippers; (2) moreover, the ICC erred, as a matter of law, in concluding a carrier taking possession of a filled container receives tender of a commodity in bulk form; (3) the ICC erred in finding, as a fact, a shipper who provides a conventional trailer to transport a shipper's container provides the "practical equivalent" of a tank vehicle; (4) the ICC's findings of fact are inconsistent with their ultimate rulings of law; and (5) the ICC ignored the mandates of the National Transportation Policy.

■ 1. That the scope of judicial review of decisions of the Interstate Commerce Commission is limited has been too long recognized in this district[18] and in numerous cases in the Supreme Court[19] to require further articulation. E.g.,

"The [Interstate Commerce] Commission is the expert in the field of transportation. And its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates." East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917.[20] "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the [Commission]." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, at 286–287, 54 S.Ct. 692, 78 L.Ed. 1260. "[T]his court's function in matters of this nature is not to substitute its independent judgment for that of the Commission, for the Commission's discretion is to draw its conclusions from all the circumstances which occur in specific instances." Acme Fast Freight v. United States, D.C.Del., 146 F.Supp. 369, 372, 373.

The Supreme Court has kept the boundary-line dividing judicial and ICC functions a stark one, even when reversing a Commission judgment. For "it is the Commission, not the courts, that brings an *expertise* to bear on the problem, that makes the findings, and that grants or denies the applications." I. C.

18. Schenley Distillers Corp. v. United States, D.C.Del., 50 F.Supp. 491 (1943); Transamerican Frt. Lines v. United States, D.C.Del., 51 F.Supp. 405 (1943); Kansas City Leavenworth Tptn. Co. v. United States, D.C.Del., 51 F.Supp. 916 (1943); Casale, etc. v. United States, D.C.Del., 52 F.Supp. 1005 (1944), aff'd 321 U.S. 752, 64 S.Ct. 640, 88 L.Ed. 1052; Schenley Distillers Corp. v. United States, D.C.Del., 61 F.Supp. 981 (1945), aff'd 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181; Seatrain Lines v. United States, D.C.Del., 64 F.Supp. 156 (1946), aff'd 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396; Great Northern Rwy. v. United States, D.C.Del., 81 F.Supp. 921 (1948), aff'd 336 U.S. 933, 69 S.Ct. 750, 93 L.Ed. 1093; Acme Fast Freight v. United States, D.C.Del., 116 F.Supp. 97 (1953); Acme Fast Freight v. United States, D. C.Del., 146 F.Supp. 369 (1956); Seatrain Lines v. United States, D.C.Del., 152 F.Supp. 619 (1957), aff'd 355 U.S. 181, 78 S.Ct. 265, 2 L.Ed.2d 186; Luck-

enbach S.S. Co. v. United States, D.C. Del., 179 F.Supp. 605 (1959), aff'd 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719; North Carolina Nat. Gas Corp. v. United States, D.C.Del., 200 F.Supp. 745 (1961); Lester C. Newton Trucking Co. v. United States, D.C.Del., 209 F.Supp. 600 (1962).

19. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Rochester Telephone Corp. v. United States, 307 U.S. 125, 138–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Interstate Commerce Commission v. Union Pacific Railroad, 222 U.S. 541, 547–548, 32 S.Ct. 108, 56 L.Ed. 308 (1912); Illinois Central Railroad v. Interstate Commerce Commission, 206 U.S. 441, 454–455, 27 S.Ct. 700, 51 L.Ed. 1128 (1907).

20. Cf. Newton Trucking Co. v. United States, D.C.Del., 209 F.Supp. 600.

**874**

C. v. J-T Transport Co., 368 U.S. 81, at 93, 82 S.Ct. 204, at 211, 7 L.Ed.2d 147. But, judicial deference to the ICC's administrative findings is not boundless. "[*E*]*xpertise* is not sufficient by itself. Findings supported by substantial evidence are required. * * *" I. C. C. v. J-T Transport Co., supra.[21]

◼ Determination of whether the ICC's construction of the outstanding certificates and the statute here involved is unreasonable, must rest, at bottom, on the rationality of the application of its findings of fact [22] and to its ultimate rulings of law.

[4] 2. Plaintiffs, in fact, limit their complaint to the situation where the container is shipper-supplied and where the carrier provides neither loading nor unloading services, but merely transports the shipper's container in ordinary vehicles. The fact-inference which the ICC drew from this evidence was "the aggregate of facilities provided constitutes a property-carrying unit which is the practical equivalent of a tank or hopper type vehicle." This was a legitimate inference —one within its particular competence as a trier of the facts. As posed by the ICC, the final issue in these proceedings was one of analogy: e. g., were the C & S containers closer to packages or to tanks.[23] So stated, the holding that the containers were package-like when *treated as packages* (i. e., tendered to and received from the carrier *when filled*) is unexceptionable. Plaintiffs argue, however, that the "package" concept itself is irrelevant because "all the carrier is providing is a conventional truck" and "a conventional truck may not be temporarily converted into a tank truck merely by using it to transport a container."[24]

Nonetheless, we conclude such temporary conversion may occur for the two cogent reasons stated by the ICC:

"* * * First, by being able to tender its fungible, flowable com-

21. The most recent Supreme Court articulation of these principles states:
"Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470. The Commission must exercise its discretion under § 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id., at 91, 73 S.Ct. at 1002, 97 L.Ed. 1470. And for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J-T Transport Company, 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147; * * *." Burlington Truck Lines v. United States, 83 S.Ct. 239.

22. Plaintiffs do not contest the Commission's findings of detailed facts. Pl.Proposed Findings, p. 17. It is the function of the Commission, not only to find the facts, but also to draw legitimate inferences from those facts. I. C. C. v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Western Paper Makers Chemical Co. v. United States, 271 U.S. 268, 270–271, 46 S.Ct. 500, 70 L.Ed. 941; Merchants Warehouse Co. v. United States, 283 U.S. 501, 508, 51 S.Ct. 505, 75 L.Ed. 1227; United States v. Pan American Petroleum, 304 U.S. 156, 158, 58 S.Ct. 771, 82 L.Ed. 1262; Transamerican Freight Lines v. United States, D.C.Del., 51 F.Supp. 405, 410; Acme Fast Freight v. United States, D. C.Del., 146 F.Supp. 369, 372–373.

23. Plaintiffs' claim that to so state the issue is to ignore the statutory command that operating rights may not be "taken" except under § 212(a) of the Act, begs the question. If plaintiffs did not have the certificate authorization claimed, the decision of the Commission does not "*take*" any existing rights.

24. Plaintiffs' Brief, p. 25.

modities, minus packaging of any type beforehand, the shipper is being provided an essential element of bulk transportation which has not been available from general freight carriers in the past. Secondly, when a C & S container is placed or mounted upon a vehicle so that a fungible, flowable commodity may be poured, pumped, dumped, et cetera, into such container, the aggregate of facilities provided constitutes a property-carrying unit which is the practical equivalent of a tank or hopper type vehicle; and like such vehicles the unit in question clearly falls within the category of 'special equipment'." [25]

█ General carriers, we recognize, perform the same physical act when they transport a sack of grain preloaded by the shipper or transport a premounted Sealdbin container of grain subsequently loaded by the shipper. But, the ICC's holding that service provided to shippers becomes substantively different because of the new elements of post-loading packaging of fungible, flowable commodities traditionally carried by bulk carriers is convincing. There is little if any distinction, as Examiner Hagerty phrased it, "from a practical point of view and transportationwise between the tank truck and a flat bed trailer upon which is mounted a Sealdbin filled with liquid." [26] It is apparent "when * * * a [Sealdtank] is mounted on or in a motor vehicle, it assumes all of the aspects and attributes of a tank vehicle, providing a facility exactly comparable to a motor tank truck and has the exact utility of such a vehicle. Differently stated, the Sealdtank when mounted on a vehicle becomes a medium of transportation of the type specially adopted for service by the tank truck operators." [27] Where all the carrier does is to provide an otherwise ordinary truck for transportation of goods and does no loading or unloading of the truck, the totality of facts may still result in the denial to him of the opportunity to transport goods.[28] The grant of author-

25. 84 M.C.C. 602.

26. Examiner Hagerty's Recommended Report, p. 14.

27. Examiner Hagerty's Recommended Report, p. 23.

28. The Commission has previously held that where similar functions were performed by two units of transportation one might be the "practical equivalent" of the other and thus require similar legal treatment. Definition of Tank Cars, 104 I.C.C. 196, 201 (1925); P. B. Mutrie Motor Tptn. Co. Ext.—Benzyl Chloride, 83 M.C.C. 123, 133 (1960). Other decisions of the Commission have limited the "special equipment" category to situations where the carrier provided something more than an ordinary vehicle and ordinary over-the-road transportation. St. Johnsbury Trucking Co., Inc., Extension—Heavy Hauling, 53 M.C.C. 277 (1951); W. J. Dillner Transfer Company—Investigation of Operations, 79 M.C.C. 335 (1959), and Dallas & Mavis Forwarding Co., Inc., Extension—Galion, Ohio, 79 M.C.C. 285 (1959). The Commission is firmly bound by neither line of decision and "This Court has no concern * * * with the alleged inconsistency with the findings made in other proceedings before [the Commission]." Brandeis, J., Virginia Rwy. Co. v. United States, 272 U.S. 658, 665, 666, 47 S.Ct. 222, 71 L.Ed. 463.

Mr. Justice Jackson's statement with respect to a major change of FCC policy is apposite. "The mild measures to others and the apparently unannounced change of policy are considerations appropriate for the Commission in determining whether its action in this case is too drastic, but we cannot say that the Commission is bound by anything that appears before us to deal with all cases at all times as it has dealt with some that seem comparable." Federal Communication Comm. v. WOKO, 329 U.S. 223, 227–228, 67 S.Ct. 213, 91 L.Ed. 204. Cf. Western Paper Makers' Chemical Corp. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; Georgia Public Service Comm. v. United States, 283 U.S. 765, 775, 51 S.Ct. 619, 75 L.Ed. 1397; Northern Pacific Ry. Co. v. United States, D.C. Minn., 41 F.Supp. 439, 446, aff'd 316 U.S. 346, 62 S.Ct. 1166, 86 L.Ed. 1521; M. & M. Tptn. Co. v. United States, D.C.Mass., 128 F.Supp. 296, 301, aff'd 350 U.S. 857, 76 S.Ct. 102, 100 L.Ed. 762; ABC Frt. Fwdg. Corp. v. United States, S.D.N.Y., 169 F.Supp. 403, 405; Allen v. United States, S.D.Fla., 187 F.Supp. 625, 627; and Ace Lines, Inc. v. United States, S.D.Ia., 197 F.Supp. 591, 599.

ity to a carrier is not a *carte blanche*, limited solely by the determination of whether shipper or carrier loads the vehicle. A general carrier, for example, who wishes to offer his vehicle for transportation of explosives, to be loaded and unloaded by the shipper, is denied legal opportunity by his certificate.[29] Too, the carrier who wishes, for example, to offer his vehicle for transportation of stolen goods, to be loaded and unloaded solely by the shipper, is denied that opportunity by the general state and federal statutes.[30] A rule of law often imposes upon parties different consequences for the commission of the same physical act.

We find, as a judgment of independent legal significance, the *package-tank differentiation* as found by the ICC rational, and its application reasonable to the facts as found by the Interstate Commerce Commission *en banc* and its two Examiners.

■ 3. Other objections of the general commodity carriers to the reasonableness of the ICC's findings with respect to certificate interpretation are also without foundation. Plaintiffs argue, e. g., the ICC committed a "glaring mistake of law"[31] in finding a carrier taking possession of a filled container receives "tender" of a commodity in bulk form. Maybe the ICC's use of the word "tender" was less then felicitous, yet it did state the use of the word was limited to the "type of motor service provided rather than determining when legal responsibility for the security of property shifts' from the owner of the lading to the transporter, or vice versa."[32] Cases cited in

the field of bailments to indicate the nature of the Commission's alleged error are thus inapposite. At worst, the ICC's semantic difficulties should not be decisive of the present litigation.

4. Unlike the issue of certificate interpretation, plaintiffs' broader extension-of-service applications provoked no disagreement between the two Examiners who ruled on the applications; and none of the Commissioners of the ICC dissented from its final judgment on this point. Both Examiners and every participating Commissioner[33] concluded plaintiffs had not met the burden of proving that "the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity."[34] The ICC found "a definite prospective need on the part of the shipping public for motor common carrier transportation of flowable, fungible commodities in C & S containers;"[35] and the "vast majority of tank truck protestants [intervening defendants] do not operate the conventional or flat-bed equipment necessary for the efficient transportation of C & S container traffic;"[36] also, "with few exceptions [existing carriers] have published tariff minima of 4,000 gallons or 28,000 pounds applicable to their transportation of less-than-truckload quantities of authorized commodities;"[37] and finally, tank truckers do not have the benefit of return pay loads in their operations.[38] Plaintiffs believe these findings are inconsistent with denial of their applications.

■ We disagree. Finding of a *prospective* need on the part of the shipping

---

29. See n. 2, supra.

30. 11 Del.C. § 631; 18 U.S.C. § 2314.

31. The alleged error is referred to "incidental * * * but erroneous." Pl. Brief, p. 21.

32. 84 M.C.C. 600, n. 6.

33. Two Commissioners did not participate. The two Commissioners who dissented from Western Express noted that their "approval of the report is predicated solely upon the view that the majority holdings in the Western Express case now

represent the law on the subject, although the conclusions in the dissent * * * [in Western Express] continue to represent [our] interpretation of what the rights of general commodity carriers should be." 86 M.C.C. 77.

34. § 207(a) Interstate Commerce Act, 49 U.S.C. § 307(a).

35. 86 M.C.C. 75.

36. 86 M.C.C. 73.

37. Ibid.

38. Ibid.

public for utilization of C & S containers is not inconsistent with a finding tank carriers do not *presently* utilize equipment required for transportation of C & S containers—if tank carriers can and will meet the prospective need found by the ICC.[39] On the record available to us, we cannot conclude tank carriers are either unwilling or unable to meet that need. The ICC statement is obviously sufficient that—

"Although the tank truck protestants as a group has not thus far engaged any substantial transportation of commodities tendered into premounted C & S containers, they express a willingness and ability to do so, and their right to do so is explicitly affirmed in the Western Express case. Moreover, generally the supporting shippers admittedly have not requested this type of service from the protestant carriers."[40]

▊ Plaintiffs' argument about the findings of the ICC as to published tariff minima of the tank truck protestants be-

ing inconsistent with its ultimate holdings, is likewise unconvincing. For a long time shippers have had statutory remedies to determine if rates of tank truckers are unreasonably high.[41] Tank truckers may lower their tariff minima pursuant to specific provisions of the Interstate Commerce Act.[42] While the current high tariff minima of tank truckers may presently limit the usefulness of the C & S containers, we are not now prepared to find the tank truck industry will renege from its "unequivocal willingness * * * to satisfy shippers' needs."[43] Should tank truckers do so, new proceedings under §§ 206(a) and 207 (a) of the Act might be received with more favor by the ICC or by a reviewing Court.[44]

▊ 5. Plaintiffs' final argument is that at no place in either of the ICC's decisions, is reference made to the National Transportation Policy[45] or articulation made that the mandates of the statute were being followed. While specific reference to "the policy" is unnecessary,[46] recent Supreme Court decisions

39. Plaintiffs' cited cases indicate only that *present* ability to meet a shipping need is *one* factor to be considered in determining whether a certificate should issue pursuant to § 207(a) of the Act. See, Hayes Freight Lines, Inc., Extension—Texas, 77 M.C.C. 233, 238 (1958) ; Lahn Transportation Extension—Williamstown Junction, Docket No. MC–75527 Sub. 13 (not reported in full) ; Diamond Transp. System, Inc., Extension—Rockford, Ill., 68 M.C.C. 390, 392 (1956) ; Wamsley Extension—New England, 71 M.C.C. 13, 15 (1957).

40. 86 M.C.C. 75, 76.

41. § 216(e) I.C.A., 49 U.S.C. § 316(e).

42. § 217(c) I.C.A., 49 U.S.C. § 317(c).

43. Brief, Intervening Defendants, pp. 30, 31.

44. These same considerations are applicable to plaintiffs' claims with respect to the Commission findings re deadhead mileage of tank carrier protestants.

45. Congress' statement of policy is concise: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each ; *to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers* ; * * *—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899, 49 U.S.C. [preceding] § 1.

46. We concur with Judge Augustus Hand's conclusion, "It is clear that this expressed policy must serve as a guide to the Commission in all its decisions. * * * However, it seems equally clear that the Commission can not and should not be required to discuss each consideration expressed in the National Transportation Policy in every decision it renders. '[T]he basic findings essential to the validity of a given order will vary with the statutory authority

admonish if the ICC's findings "do not provide [the] Court with a basis for determining whether the Commission's decision comports with the National Transportation Policy, that decision must be set aside * * *." Schaffer Transportation Co. v. United States, 355 U.S. 83, 92, 78 S.Ct. 173, 2 L.Ed.2d 117.[47]

■ The key words of the Act orders those charged with administering the statute "to promote safe, adequate, economical and efficient service and foster sound economic conditions in transportation and among the several carriers." Dissenting Commissioner Webb in Western Express thought the ICC had made its choice "without reference to the provisions of the declared national transportation policy."[48] We think he was wrong. The ICC's position is apparent in its statement with respect to its power to grant new operating rights:[49] "We have no power to issue any operating rights except in accordance with the standards of Section 207 of the Act. These standards are basically designed to protect established carriers against the institution of any competing services, unless the established carriers are unable or unwilling to respond to a distinct public need for the new services proposed. Obviously, no carrier or group of carriers is entitled to blanket insulation from new competition—especially where such com-

petition results largely from development of or refinement of the tools of transportation—; but, manifestly, fairness requires that no *carte blanche* authorization be granted which would permit applicants to invade the established field of service of the bulk motor carriers whenever or wherever it is to their advantage."[50]

■ It is manifest the ICC more than met the statutory requirement of a declared national transportation policy. The Commission's sometimes implicit balancing of factors to be observed and weighed under the National Policy may not be to plaintiffs' liking; the Commission's failure to make more explicit each consideration that may have influenced it cannot be said to have provided this Court with as total a record as might have been desirable.[51] Yet the record is sufficient. In Schaffer, supra, where the record was deficient, Chief Justice Warren wrote: "The record here does not disclose the factors the Commission compared in concluding that existing rail service is 'reasonably adequate.' For example, the Commission has not determined whether there are benefits that motor service would provide which are not now being provided by the rail carriers, whether certification of a motor carrier would be 'unduly prejudicial' to the existing carriers, and whether on bal-

invoked and the context of the situation presented.' * * * it is only necessary that the essential basis of the Commission's order appear in the report so that a court can satisfy itself that the Commission has performed its function. * * *" Luckenbach S.S. Co., Inc. v. United States, S.D.N.Y., 122 F.Supp. 824, aff'd 347 U.S. 984, 74 S.Ct. 850, 98 L. Ed. 1120 (1954).

47. Cf. ICC v. J-T Transport Co., 368 U.S. 81, 91–92, 82 S.Ct. 204, 7 L.Ed.2d 147.

48. 84 M.C.C. 606.

49. That the Commission was less oblivious than plaintiffs suggest to the *existence* of a national transportation policy may be noted by its specific reference to the policy in the text of Western Express. 84 M.C.C. 590.

50. 85 M.C.C. 75.

51. Justice Frankfurter's admonition [although dissenting] in Schaffer is apposite:
"It is, however, pertinent to add that the Court's decision may serve a useful purpose if it will lead the Interstate Commerce Commission, despite its enormous volume of business, to a more detailed and illuminating formulation of the reasons for the judgment that it reaches even in that class of cases where Congress has relied on the Commission's discretion in enforcing the most broadly expressed congressional policy. Since the orders in such cases also fall under judicial scrutiny, it is desirable to insist upon precision in the findings and the reasons for the Commission's actions." 355 U.S. 83, 95, 78 S.Ct. 173, 2 L.Ed. 2d 117.

ance the public interest would be better served by additional competitive service." [52] Under the particular facts in the case at bar, however, we think the ICC has given consideration to all the factors just quoted. Moreover, no substantial aid would have benefitted this Court had the Commission directly verbalized what it clearly implied—that though present use of the new C & S containers might be curtailed by the decision this might be necessary to presently protect tank carriers. Nor would this Court have been assisted had the Commission stated specifically that though "more economical * * * service" might be provided by granting general carriers the authorization requested, "sound economic conditions" in the transportation industry might be destroyed.

In short, it is not for this Court to issue a mandate to the ICC, in returning the case for further procedural findings, to state with Einsteinian exactness how much of a contribution the new rubber containers make to the transportation field. Neither should the ICC be required to measure in dollars and cents damage that might be done to tank truckers if general carriers are here granted free rein to utilize the new technological device at this time. Additional words of the Commission in these amorphous areas would add length but not weight to the decision.

■ Any sophisticated review suggests the ICC decision was palpably a compromise; [53] it was an attempt to insure, for the present, that both general and tank carriers should continue to persevere in healthy competition. The ICC took the broad look—a look we find convincing. We think we have been told enough; the decision may suggest debate, but we do not think it reversible either as a matter of fact or law.

■ 6. The permanent injunction sought by plaintiffs will be denied and the complaint dismissed, because the conclusions of the ICC as to interpretation and public convenience and necessity [and, "National Transportation Policy"] have a rational basis and are consistent with the findings from the evidence submitted by the parties.

Orders may be submitted.*

CALEB M. WRIGHT, Chief District Judge (dissenting).

I respectfully dissent from the learned opinion of the majority of the Court on the narrow but nevertheless crucial issue of whether or not the Commission has considered and properly applied the National Transportation Policy.[1]

52. 355 U.S. 83, 90, 78 S.Ct. 173, 2 L.Ed. 2d 117.

53. No air of sacrosanctity thereupon envelops the decision; if anything, the decision becomes more subject to careful judicial scrutiny to insure the Commission properly "performed its function" See, n. 46, supra.

* The opinion herein incorporates such findings and conclusions as are required by F.R.Civ.P. rule 52.

1. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899 (1940), 49 U.S. C.A. note preceding § 301.

The declaration as it appeared was identical to the declaration in the Motor Carrier Act of 1935. The latter was primarily directed towards the prevention, as was the case with so much other New

In this posture a reviewing court at the outset is faced with three basic legal problems involving the Congressional dictate:

(1) To what extent, if at all, the Commission must consider the transportation policy in interpretative proceedings as distinguished from the ordinary Section 207 applications for authority;

(2) how explicit the ICC must be in its consideration of the Congressional objectives; and

(3) to what extent a court should review the Commission's holdings on policy issues.[2]

Generally solution rests in the language and holdings of the Supreme Court, and specifically in the Court's mandate as expressed in Schaffer Transp. Co. v. United States.[3]

Before Schaffer, the importance of the Congressional policies in Commission decisions had been emphasized. For example, three years after the Act's passage, the Supreme Court, in a case involving the legality of a proposed consolidation of truckers,[4] said the National Transportation Policy "is the Commission's guide to 'the public interest' * * *."[5] Mr. Justice Rutledge, speaking for the Court, also noted that the ICC's power to grant immunity under the anti-trust laws in "no sense relieves the Commission of its duty, as an adminis-

trative matter, to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of the national transportation policy."[6] In a case involving the legality of rates,[7] the Court said "it [the ICC] was charged not only with seeing that rates and services of each are reasonable and not unduly discriminatory, but that they are coordinated in accordance with the national transportation policy * * *."[8] And, in several cases,[9] the Commission was admonished to give careful consideration to that part of the National Transportation Policy that sought to preserve the inherent advantages of the different modes of transportation.

The issue before the Supreme Court in Schaffer was "whether the Interstate Commerce Commission adequately and correctly applied the standards of the National Transportation Policy in denying a motor carrier's application to provide service between points now served exclusively by rail."[10] The Court, speaking through Chief Justice Warren, held the ICC delict in that the latter failed to evaluate the critical factor of inherent advantages of the modes of transportation. The majority while conceding the Commission has wide discretion in deciding whether the public interest warrants a particular service, specifically pointed out "that discretion must be exercised in conformity with the declared policies of the

Deal legislation, of ruinous competition. See W. K. Jones, Antitrust and Economic Regulation: An Introduction to Comparative Analysis, 19 A.B.A. Antitrust Section, 261, 279–99. However, a reading of the National Transportation Policy would seem to indicate that Congress had other important goals beside the prevention of cutthroat competition in mind and the Supreme Court has so held. See infra.

2. The scope of Court review and the duties of the Commission are, of course, intertwined concepts. They stand in direct relation—i. e., the broader the duty the broader the scope.

3. 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

4. McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

5. 321 U.S. at 82, 64 S.Ct. at 378.

6. 321 U.S. at 87, 64 S.Ct. at 380.

7. Eastern-Central Motor Carriers Assoc. v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668 (1944).

8. 321 U.S. at 206, 64 S.Ct. at 505.

9. Dixie Carriers, Inc. v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934 (1956); ICC v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947).

10. 355 U.S. at 84–85, 78 S.Ct. at 175.

Congress." [11]  The Court then pointed up the role of the reviewing court:

> "To see whether those policies have been implemented we look to the Commission's own summary of the evidence, and particularly to the findings, formal or otherwise, which the Commission has made. Just as we would overstep our duty by undertaking to evaluate the evidence according to our own notions of the public interest, we would shirk our duty were we summarily to approve the Commission's evaluation of the record without determining that the agency's evaluation had been made in accordance with the mandate of Congress." [12]

The Court then proceeded to specifically point out the defects in the Commission's opinion and proceedings. The ICC had cast its first principal conclusion in terms of adequacy of service. While this conclusion was relevant, it was defective because "The record here does not disclose the factors the Commission compared in concluding that existing rail service is 'reasonably adequate.' " [13] Clearly, to reject the application on this ground alone would be to fatally disregard relevant portions of the Declaration of Policy, and this alone warrants reversal. [14] The ICC's second basic conclusion was that witnesses mainly supported the application to obtain reduced rates. Thus, their testimony was disregarded. The Court concluded that this approach runs counter to the National Transportation Policy; lower rates are "precisely the sort of 'inherent advantage' * * *"

that the Congress requires the Commission to recognize. [15]  In short, the Court reversed because the ICC failed to consider an inherent advantage (lower rates) of the applicant's service and because the findings on adequacy were insufficient to allow the Court to measure the ICC's opinion against the yardstick of the National Transportation Policy. [16]

The Supreme Court concluded with this admonition:

> "We do not minimize the complexity of the task the Commission faces in evaluating and balancing the numerous considerations that collectively determine where the public interest lies in a particular situation. And we do not suggest that the National Transportation Policy is a set of self-executing principles that inevitably point the way to a clear result in each case. On the contrary, those principles overlap and may conflict, and, where this occurs, resolution is the task of the agency that is expert in the field. But there is here no indication in the Commission's findings of a conflict of policies. Shippers and receivers now served exclusively by rail have testified to the advantages they would gain from a proposed motor carrier service. There is no finding that the authorization of the proposed service would impair the sound operation of the carriers already certificated. Nor has the Commission properly evaluated the advantages urged by the supporting witnesses to determine whether the standard

11. 355 U.S. at 88, 78 S.Ct. at 176.

12. 355 U.S. at 88, 78 S.Ct. at 176.

13. 355 U.S. at 90, 78 S.Ct. at 177. At this point, the Court continued, saying:
    "For example, the Commission has not determined whether there are benefits that motor service would provide which are not now being provided by the rail carriers, whether certification of a motor carrier would be 'unduly prejudicial' to the existing carriers, and whether on balance the public interest would be better served by additional competitive service."

The majority treats this language as the "standard" of Schaffer. This seems to me to be only an exemplification of a broader principle, i. e., that the ICC must make findings, formal or otherwise, which allow the courts to see that the Commission's opinion comports with the National Transportation Policy.

14. See 355 U.S. at 91, 78 S.Ct. at 178.

15. 355 U.S. at 91, 78 S.Ct. at 178.

16. See 355 U.S. at 92, 78 S.Ct. at 178.

of public convenience and necessity has been met." [17]

It is abundantly clear under Schaffer that not only must the Commission consider the National Transportation Policy in its proceedings,[18] but more than that, it cannot ignore any part of the policy which is operative by reason of the factual pattern of the particular case.[19] The Commission must make findings, formal or otherwise, that will allow a reviewing court to see that the ICC decision comports with the Congressional objectives.[20] "Deference to expertise" still exists as to most issues,[21] but when the National Transportation Policy is involved deference is contracted—scope of review expanded. The Courts must not only see that the ICC has performed its duties but may also substitute its judgment with a slightly freer hand when the broad, judicially definable, standards of the Preamble are in play.[22]

The ICC was under a duty to consider and apply the National Transportation Policy in this type of interpretative proceeding—i. e., the Commission had this affirmative duty in Western Express. The cases under review involve two opposing segments of a highly competitive although regulated industry. Commodities formerly manufactured so as to be transported only in containers of one kind or another are now shipped in bulk. Many fungible, flowable commodities heretofore movable only in tank trucks or tank cars can now be transported in conventional flat-bed trucks through the use of sealed tanks or similar collapsible containers. The economic impact of these new technological developments may seriously affect vital elements of our transportation system. Another result may well be reduction in transportation costs of many and varied commodities heretofore easily categorized as transportable only by common carriers on conventional truck beds or by special carriers in tank trucks.

The economic importance of this case makes it clear that the mere reading of the words in the certificate of the parties is not enough. To do so would be contrary to the spirit of the Congressional mandate that "All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." [23] Added emphasis, if needed, is supplied by reference to the numerous Supreme Court decisions stressing the applicability of the National Transportation Policy in many diverse proceedings.[24]

17. 355 U.S. at 92, 78 S.Ct. at 178.

18. This is also clear from the Court's stress in such proceedings as rate-making, certification, and consolidation and follows inexorably from the last sentence of the Preamble.

19. See text accompanying notes 15 and 17.

20. The federal courts should not substitute its wisdom for that of the Congress. Basically, it should apply principles neutrally. Cf. Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1 (1959). However, the importance of ensuring explicitness on the ICC's part cannot be underestimated. In this way, the Congress and the public will clearly see the nature of the Interstate Commerce Act. And, if they wish, the Act could be repealed or affirmed. This, of course, would not or would be unlikely to occur if the policies were hidden by an ambivalent cloud.

21. One wonders whether this time-worn concept is in need of critical reexamination. In a tentative draft for the Administrative Conference, entitled Licensing of Truck Operations by the Interstate Commerce Commission, Professor W. K. Jones of the Columbia Law School discusses the tremendous workload of the ICC. In 1960, 4,482 application cases were closed. The time for each case ranged from an average of 5.5 months (for dismissal prior to examiner's action) to 31.7 months (for reopened cases). This Court cannot completely set out data on the efficiency of the ICC. But, the type of information I have noted above should make the courts ponder the Commission's expertise.

22. This is the tenor of Chief Justice Warren's opinion.

23. This is the last sentence of the National Transportation Policy which is set out in footnote one of this opinion.

24. The correctness of these conclusions is admitted by the Commission. See Joint Brief for the United States of

The operative facts as gleaned from the evidence in *Best Way* and *Western Express* call into play several elements of the National Transportation Policy. Unrestricted use of the C & S containers by the general commodity carriers will divert business from the tanktruckers;[25] here, the clause—"foster sound economic conditions in transportation"—is relevant. These words have been interpreted as protecting established carriers against ruinous competition and indeed, this is what Congress had in mind.[26] Intertwined with the evidence that amply established public need were facts that at distances of 400 miles or more the rate structure of the general freight carrier results in lower costs to the shipper.[27] The tank carrier rate structure reflects a high incidence of empty return mileage. Under the Supreme Court decision in I. C. C. v. J-T Transport Co.,[28] the relative rate structures are a factor to be considered under the "economical * * *

service" portion of the National Transportation Policy.[29] C & S containers only can be used efficiently on flat-bed trucks.[30] The tanktruckers will have to buy flat-bed trucks to supply the service.[31] This would still leave them in the anomalous position of being at a dead-haul disadvantage. Their certificates would only allow them use of flat-bed trucks (it should be noted that these vehicles will represent a substantial investment) for a very limited purpose. These facts are in the record. They call into operation the "economical and efficient service" element of the policy.[32] Some of these considerations lead to one result in *Western Express*; some to another.

In seeking to determine whether the Commission has considered and evaluated all portions of the policy by reason of the facts, I find little comfort in the ICC's discussions and findings. These were the ICC's basic conclusions:[33] 1)

America and the ICC, p. 39, Roadway Express, Inc. v. United States. It therein states that:

> "Of course, the Commission must take cognizance of all the elements and factors embraced in the National Transportation Policy, before rendering decisions of the importance of those involved in the Western Express and Best Way groups of cases. The last sentence of that Policy specifically provides for such administration by the Commission."

To be sure, if the issue was whether peanut oil is a vegetable, a different problem would be presented.

25. See e. g. 84 M.C.C. 595–597.

26. See note 1, supra.

27. See 84 M.C.C. 595; 86 M.C.C. 70, 71, 73.

28. 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

29. See 368 U.S. at 91–92, 82 S.Ct. at 210–211. The Court, talking in a slightly different context, said: " * * * contract carriage may be more 'economical' than common carriage by motor or rail within the framework of the national transportation policy, as it is defined in the Act—'The Commission's guide' to the public interest."

30. 86 M.C.C. 73.

31. 86 M.C.C. 73; 84 M.C.C. 596–597.

32. While this portion of the National Transportation Policy has not been emphasized as much as others, it is clear that these facts fall within the literal intent of these words. Surely, no court should imply that Congress window-dresses; by using the above phrase it must have intended that these facts be considered.

33. This member of the court will read both opinions—*Best Way* and *Western Express*—together. I do this because the ICC "adopted" *Western Express* in *Best Way* and because the two are challenged together in the proceeding before this court. It should be noted, however, that the ICC's basic conclusions with reference to the National Transportation Policy, appear in *Best Way*. The decision in *Western Express* may be summarized as no reason appears to justify "applying a different rule [for differentiating between the two types of service] or for establishing, arbitrarily, a new one * * *." 84 M.C.C. at 600. There are several justifications for reading the opinions separately. They were decided a month apart and there is no explicit indication that the ICC intended its reasoning in *Best Way* to

there is a distinct public need for shipment by C & S containers; 2) by reason of its decisions general commodity carriers will have an opportunity to generate a substantial amount of traffic; 3) tank-truckers, who aver they are ready, willing and able to supply the service, should get the first chance lest a serious impairment of their capital structure occur; and 4) apart from their concern over the deadhaul factor, shippers express no material dissatisfaction over the present service.

At worst, the ICC has ignored certain relevant portions of the National Transportation Policy. It is reasonable to conclude that the Commission has failed to evaluate the rate factor and others under the "economical and efficient service" heading. At best, though conflict is apparent and decision may be contrary to the public interest, it is extremely difficult, if not impossible, to follow the ICC's reasoning. Both alternatives justify reversal.

It is my view that in a case of this importance it must be clear, perhaps to the point of explicitness, that the ICC has considered, weighed, resolved and reasoned to a result consistent with the National Transportation Policy. The majority would rely to a great extent on what they believe to be implicit in the opinion to find the requisite consideration; their rule is a concomitant of the "deference to expertise" notion. It is my considered judgment that a reviewing court should be able to confidently ascertain that, in the words of Mr. Justice Rutledge,[34] the "guide to the public interest" was *reasonably* followed.

I would remand to the ICC to allow it to reconsider its interpretations of the certificate exceptions "commodities in bulk" and "requiring special equipment" and to allow it to reconsider and articulate its reasoning relative to the National Transportation Policy.[35]

apply to *Western*. If the cases were treated separately Western Express would be barren of any consideration of the policy.

34. See note 5, supra.

35. Both cases would be remanded in their entirety since a different interpretation of the certificates could render the Section 207 applications moot.